IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENKA LAB, LLC and | ) | |
| BRONNIKOV CONSULTING, LLC | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | Case No.: _____ |
| | ) | |
| SIROFCHUCK VENDING, LLC | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

COMPLAINT – JURY TRIAL DEMANDED

Jenka Lab, LLC ("Jenka Lab") and Bronnikov Consulting, LLC ("Bronnikov") (collectively, "Plaintiffs") file this Complaint against Defendant Sirofchuck Vending, LLC, ("Sirofchuck" or "Defendant") as follows:

INTRODUCTION

1.     Bronnikov owns the exclusive rights to the software for the Jenka Lab gaming systems, specifically the Aurora Link game, including its series of games, and holds federal copyright registrations issued by the United States Copyright Office for the associated computer files and artwork.

2.     These include Registration Number TX0009178881, obtained on September 18, 2022, for Aurora Link game source code, and Registration Number VA0002354716, obtained on September 13, 2022, for the Aurora Link game artwork. Collectively, these are referred to as the "Copyrighted Works." Hereinafter, the above copyrighted works will be referred to collectively as the "Copyrighted Works".

3.    For years, Jenka Lab has been the exclusive distributor of Bronnikov's amusement machines created by Bronnikov and the exclusive licensee and/or owner of the registered JENKA LAB and JENKA LAB design mark trademarks (collectively, the "Jenka Lab Marks").

4.    Plaintiffs bring this action against Defendant for unauthorized use, distribution, and public display of pirated or hacked versions of the Copyrighted Works, as well as unauthorized and infringing use of Plaintiffs' trademarks.

5.    Defendant's counterfeit machines mimic authentic products but are substandard imitations that diminish the value of the genuine Jenka Lab Aurora Link game (the "Counterfeit Products").

6.    Because Bronnikov cannot verify the conditions under which these counterfeit goods are manufactured, stored, and sold, Defendant's actions compromise quality control and safety standards, causing irreparable harm. Plaintiffs seek relief under the United States Copyright Act, including injunctive relief, damages, and Defendant's profits from the infringing conduct.

7.    Plaintiffs sue for, among other things, copyright infringement under the United States Copyright Act, including preliminary and permanent injunctive relief, Plaintiffs' damages and/or Defendants' profits from Defendants' willfully infringing conduct, and other monetary damages.

8.    In addition, Jenka Lab brings ancillary claims related to its loss of sales and revenues from the sale of the software--i.e., the Copyrighted Works. Jenka Lab serves as the exclusive distributor of the Copyrighted Works.

<u>PARTIES, JURISDICTION, AND VENUE</u>

9.    Bronnikov, based in Buford, Georgia, designs and manufactures software, 3-D artwork, and audiovisual effects for electronic games. The company develops content for markets like skill-based redemption and electronic pull-tabs. Notably, Bronnikov provides software and

effects for games distributed by Jenka Lab, licensed for the Georgia Lottery's Coin Operated Amusement Machine (COAM) market.

10.     Jenka Lab, LLC is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Buford, Hall County, Georgia. Jenka Lab designs, develops, and distributes products for various boards, nudge, skill, redemption, and amusement games markets.

11.     Upon information and belief, Defendant is a Pennsylvania limited liability company with a registered office at 625 3rd Avenue, Sutersville, Pennsylvania 15083 in Westmoreland County.

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, as Plaintiffs allege claims arising under the laws of the United States, including, but not limited to, federal copyright law.

13.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332(a), as the Plaintiffs and Defendant are citizens of different states, and the claims asserted herein exceed $75,000.

14.     This Court has personal jurisdiction over Defendant because they transacted business and committed and directed the acts occurring herein in the Commonwealth of Pennsylvania, and Plaintiffs' claims arise from those activities.

15.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because a substantial part of the property that is the subject of this action is situated in this District.

<u>STATEMENT OF FACTS</u>

<u>Bronnikov's Business and its Intellectual Property</u>

16.     Since at least 2019, Bronnikov has invested millions of dollars in developing high-quality and reliable electronic games of skill. Indeed, Bronnikov has hired a growing team of dedicated employees who develop from scratch all design and software components of Bronnikov's games in-house, while acting within the scope of their employment, including the games' source code, object code, 3-D and other artwork, static images, and other visual and audiovisual effects that help to make Bronnikov's games an enjoyable experience for the end-user. In creating these products, Bronnikov did not copy any of the artwork, static images, or audiovisual effects from another game or a non-Bronnikov author.

17.     Bronnikov also has invested substantial time, effort, and resources in marketing its games to customers and providing top-level customer service to those customers who purchase Bronnikov's games.

18.     Bronnikov's games are well-known and widely respected by its customers (e.g., the operators who purchase the games) and end-users (e.g., the individuals who play the games), each of whom have come to expect high-quality games and top-notch customer service from Bronnikov.

19.     By investing these resources over several years, Bronnikov has established itself as a global leader in the electronic gaming industry. As a global leader, Bronnikov protects its business through proper protection, including registration, of its copyrighted works, protection of its trade secrets, and protection of its intellectual property, including through enforcement actions, such as this one, to ensure its rights and its intellectual property assets are not infringed or misappropriated.

20.     Indeed, in addition to the Copyrighted Works, Bronnikov owns multiple copyrights in and to the computer files associated with its video games. Bronnikov actively protects its

copyrighted works by having nearly thirty active, registered copyrights surrounding its business and products.

21.    Bronnikov also takes commercially reasonable measures to ensure the confidentiality of its proprietary software, including the software associated with the Copyrighted Works. In this regard, Bronnikov: (a) maintains and protects its source code as a trade secret; (b) takes steps to prevent end-users from accessing its source code through a process called "obfuscation;" and (c) actively protects the artwork used in its computer files and software, including the Copyrighted Works, by creating, registering, and maintaining its copyrights in both the static images and the audiovisual effects used in its software.

22.    Among its various products, Bronnikov has created, owns, and sells, its Aurora Link game comprised of software, both source code and object code, and artwork that make the Aurora Link game well-known in the marketplace and distinctive to Bronnikov. The Aurora Link artwork includes both static images, as well as the audiovisual effects that connect those static images.

23.    Relevant to the instant dispute, Bronnikov owns federal registrations in the Copyrighted Works. True and correct copies of the registrations for the Copyrighted Works are attached hereto as Exhibit 1.

24.    Bronnikov distributes its Aurora Link game, including the Copyrighted Works, in stand-alone gaming cabinets, or as independent software, sold through its exclusive distributor, Jenka Lab. End-users purchase these cabinets or the software from Jenka Lab and then offer them for use by end-users.

25.    Computer software, like the Aurora Link game, is comprised of source code and object code. Source code is created by a computer programmer with a text editor and is readable

by humans. Object code[1] is the output of a source code compiled into a machine code that contains a sequence of machine-readable instructions.

26.    With respect to the source code and object code associated with the Aurora Link game (and other games), Bronnikov creates the source code and saves it in multiple "library" files that are accessible only to employees who need access to them and who have executed a confidentiality agreement. Pursuant to the terms of this confidentiality agreement, Bronnikov's employees are prohibited from disclosing any information concerning Bronnikov's "confidential information," including source code. This obligation survives the termination of any employee's employment with Bronnikov.

27.    Using a computer program known as a compiler, Bronnikov transforms these human-readable library files into machine-readable object code, which object code forms the basis for the executable file that launches each game.

28.    The compiler includes an obfuscation feature,[2] which allows Bronnikov to build redundancies into each version of its Jenka Lab Games to prevent tampering and reverse engineering of its source code. Bronnikov obfuscated the source code for each of its Jenka Lab Games.

29.    A certain "library" file controls Bronnikov's activation mechanism ("Activation Mechanism"). The Activation Mechanism is responsible for determining whether the Jenka Lab Games are authentic.

---

[1] Object code is a series of 1s and 0s and is generally only readable by machines. While a human might be able to understand the patterns with enough study, doing so would take a significant amount of time.
[2] Obfuscation is the deliberate act of creating object code with redundancies, so that it is even more difficult for humans to read and understand.

30.     Bronnikov takes commercially reasonable measures to maintain its "library" files, including both its source code and its Activation Mechanism. These "library" files are confidential and proprietary to Bronnikov and are maintained as trade secrets (together, the "Source Code").

31.     In particular, access to these "library" files is limited to employees who have a need to know the information and who have executed confidentiality agreements.

32.     Moreover, because Bronnikov obfuscates its Source Code, it is not generally known outside of Bronnikov and further allows Bronnikov to maintain its Source Code as a trade secret. Indeed, because Bronnikov obfuscates its Source Code, it would be exceedingly difficult for someone, even a sophisticated computer programmer, to re-create the exact logic used in the Source Code.

33.     Thus, Bronnikov's "library" files derive independent economic value by remaining secret. Indeed, Bronnikov's Source Code, and its secrecy, allows Bronnikov to maintain its competitive advantage in the marketplace.

34.     Bronnikov also  owns several United States trademark applications, collectively known as the Bronnikov Marks more fully outlined below.

35.     On July 19, 2024, Bronnikov filed an application to register the mark AURORA SUPER LINK (Serial No. 98657186) with the United States Patent and Trademark Office (the "Aurora Super Link Mark").  A true and correct copy of the Application is attached hereto as Exhibit 2. The Aurora Super Link Mark is valid and subsisting.

36.     On July 19, 2024, Bronnikov filed an application to register the mark AURORA CLASSIC (Serial No. 98657192) with the United States Patent and Trademark Office (the "Aurora Classic Mark").  A true and correct copy of the Application is attached hereto as Exhibit 3. The Aurora Classic Mark is valid and subsisting.

37.     On September 17, 2024, Bronnikov filed an application to register the mark AURORA XPERIENCE (Serial No. 98754180) with the United States Patent and Trademark Office (the "Aurora Xperience Mark").  A true and correct copy of the Application is attached hereto as Exhibit 4. The Aurora Xperience Link Mark is valid and subsisting.

38.     On December 17, 2024, Bronnikov filed an application to register the mark AURORA LINK (Serial No. 98657217) with the United States Patent and Trademark Office (the "Aurora Link Mark").  A true and correct copy of the Application is attached hereto as Exhibit 5. The Aurora Link Mark is valid and subsisting.

Jenka Lab's Business and its Intellectual Property

39.     Jenka Lab, as the exclusive distributor, sells and distributes Aurora Link. Through Jenka Lab, the Aurora Link game, including the Copyrighted Works, reach end-users, who, in turn, place the Aurora Link game in their respective places of business.

40.     In order to obtain the Aurora Link game, among others, and thus the Copyrighted Works, an individual or business must purchase the Aurora Link game directly from Jenka Lab or another legitimate reseller of the Aurora Link game, to whom Jenka Lab initially sold legitimate Jenka Lab games (e.g., Ivey Promotions out of Georgia and Great Lakes Amusement out of Wisconsin).

41.     Jenka Lab began using its JENKA LAB word mark and JENKA LAB design mark on January 8, 2020 and in use in commerce on July 21, 2020 in connection with gaming machines, namely, slot machines and video lottery terminals.

42.     On September 21, 2020, Jenka Lab filed an application to register the mark JENKA LAB (Registration No. 6400827) with the United States Patent and Trademark Office. The mark was registered with the Trademark Office on June 29, 2021 (the "Jenka Lab Mark"). A true and

correct copy of the Certificate of Registration is attached hereto as <u>Exhibit 6</u>. The Jenka Lab Mark is valid and subsisting.

43. On September 22, 2020, Jenka Lab filed an application to register the JENKA LAB design mark (Registration No. 6400828) with the United States Patent and Trademark Office. The mark was registered with the Trademark Office on June 29, 2021 (the "Jenka Lab Design Mark"). A true and correct copy of the Certificate of Registration is attached hereto as <u>Exhibit 7</u>. The Jenka Lab Design Mark is valid and subsisting.

44. To promote its goods, Jenka Lab has used the JENKA LAB word mark and JENKA LAB design mark (collectively, "Registered Marks") in many ways including on its website at <jenkalab.com>, on social media sites via authorized promoters < facebook.com/photo?fbid=668530984978927&set=pb.100054660930664.-2207520000>, and on the game systems themselves to name a few.

<u>Defendant's Infringement of the Copyrighted Works and the Mark</u>

45. On or about February 2025, Plaintiffs discovered that Defendant was using, selling, and distributing counterfeit versions of the Aurora Link game and Copyright Works, allowing customers to use these unauthorized games.

46. Pirated software is the unauthorized use, copying, or distribution of copyrighted software and can take many forms, including the unauthorized, illegal access to protected software and/or reproducing or distributing counterfeit or otherwise unauthorized software.

47. After becoming aware of Defendant's use of at least one unauthorized machine, Plaintiffs investigated and confirmed that such use of unauthorized machines by Defendant was happening and ongoing.

48.    Upon information and belief, Defendant purchased and/or sold unauthorized, pirated, and/or hacked versions of the Aurora Link game on the secondary market ("Illicit Games"). These counterfeit cabinets and the Illicit Games therein were neither created, sold, nor otherwise authorized or licensed by Plaintiffs.

49.    Upon information and belief, Defendant has either purchased and/or sold additional Illicit Games or have the means, motive, and capability to obtain, provide, and use more Illicit Games.

50.    Upon information and belief, the Illicit Games are the product of a third party unpackaging, decompiling, and de-obfuscating Bronnikov's trade secrets. Using this process, the third parties or Defendant were able to gain access to Bronnikov's multiple "library" files, which contain Bronnikov's proprietary Source Code and trade secrets. In other words, the third parties or Defendant were able to misappropriate Bronnikov's trade secrets by undoing the deliberate and intentional steps Bronnikov takes and had taken to prevent third parties from ascertaining Bronnikov's trade secrets.

51.    Upon information and belief, through these efforts, third parties or Defendant were able to bypass Bronnikov's validation logic by altering the Activation Mechanism and market and sell hacked versions of the Illicit Games.

52.    The hacked/pirated/counterfeit Illicit Games are sold for significantly less than genuine products. A genuine Aurora Link game costs $2,495 per game board. Upon information and belief, Defendant paid significantly less for their Illicit Games. This model allows the misappropriating third party (Defendant) to undercut Bronnikov's market share and steal Bronnikov's profits. In addition, the Defendant is able to increase their profits at the expense of Bronnikov and Jenka Lab. By purchasing Illicit Games at a cheaper price, Defendant is able to

maximize profits by receiving a larger portion of net revenue, and ultimately secure locations that otherwise would use Plaintiffs' legitimate machines.

53. Defendant purchased and/or vended at least one (1) Illicit Game that knowingly misappropriated Bronnikov's trade secrets and Copyrighted Works.

54. Defendant vended and/or purchased the Illicit Games for the purpose of displaying them and offering them for use by end-users entering Defendant's location. Upon information and belief, Defendant purchased the Illicit Games for only a fraction of the amount of which genuine games containing the Copyright Works cost, thereby increasing their profits. Moreover, Plaintiffs' profits have therefore decreased as a result of the Illicit Games

55. Defendant's Illicit Game(s) are nearly identical to the Copyrighted Works, in that they present the same game play and almost identical artwork. However, the Illicit Game(s) perform at slower speeds than the Copyrighted Works, and the artwork in the Illicit Game(s) present dimmer artwork than the Copyrighted Works. Additionally, the game boards that run the Illicit Games are designed differently from Plaintiffs' genuine game boards.

56. Upon information and belief, Defendant has earned a revenue on the Illicit Games of at least $99,903.

<u>The Illicit Games Infringe the Copyrighted Works and Registered Marks</u>

57. Bronnikov created, designed, and owns the audiovisual effects that tie together the artwork used in the Copyrighted Works, and in this instance the Copyrighted Works effects depict a series of related images that, when shown in a sequence, impart an impression of motion and the expression fixed in motion.

58. The Copyrighted Works are wholly original, and Bronnikov is the exclusive owner of all right, title, and interest in the Copyrighted Works and the owner of all the exclusive rights

associated with those Copyrighted Works, including, but not limited to, the right to reproduce its software in copies and to distribute those copies to the public. Additionally, 17 U.S.C. § 106(5) also provides Bronnikov, as copyright holder for "motion picture or other audiovisual works", the exclusive right to display the work publicly.

59.    Defendant has published and publicly displayed unauthorized, unlicensed, and counterfeit reproductions of the Copyrighted Works, without Bronnikov's authorization, consent, or knowledge, and without any compensation to Bronnikov. In particular, Defendant has published and publicly displayed unauthorized, unlicensed, and counterfeit versions of the Copyrighted Works each time consumers buy and play their Illicit Game(s).

60.    As a result of Defendant's willful actions, Bronnikov has been damaged, and continues to be damaged, by the unauthorized publication and public display of counterfeit versions of the Copyrighted Works. Defendant has never accounted to or otherwise paid Bronnikov for its improper, illegal, and unauthorized use of counterfeit versions of the Copyrighted Works.

61.    The Defendant's acts are causing, and, unless restrained, will continue to cause damage and immediate irreparable harm to Bronnikov for which Bronnikov has no adequate remedy at law.

The Illicit Games Infringe the Source Code

62.    Bronnikov considers its Source Code confidential information and a trade secret and has taken reasonable steps to keep its Source Code secret.

63.    Defendant purchased the Illicit Game(s), which actually misappropriated Bronnikov's Source Code.

64.    Defendant's actions, including Defendant's use, marketing, and/or selling of the Illicit Game(s), also misappropriates Bronnikov's Source Code.

65.    The Defendant's foregoing actions, including the improper access to and use of Bronnikov's Source Code, were done without Bronnikov's permission.

66.    Defendant's acts are causing, and, unless restrained, will continue to cause damage and immediate irreparable harm to Bronnikov for which Bronnikov has no adequate remedy at law.

67.    Defendant's acts have caused, and will continue to cause, Bronnikov to lose profits.

<u>Defendant's Impact on Bronnikov and Jenka Lab</u>

68.    Jenka Lab is Bronnikov's exclusive distributer of the Aurora Link game. Jenka Lab sells Aurora Link game to end-users, who, in turn, use them in their places of business.

69.    Before Defendant began offering and displaying the Illicit Games, consumers associated the Aurora Link game with Jenka Lab and Bronnikov.

70.    Defendant's Illicit Games are similar in every way to authentic Jenka Lab Games sold and distributed by Jenka Lab.

71.    Consumers likely will associate Defendant's Illicit Games with Bronnikov and Jenka Lab because, *inter alia*, Defendant's Illicit Games mimic in every way the experience provided by the Aurora Link game.

72.    Defendant has engaged in an unfair method of competition and unfair trade practice.

73.    Defendant's acts are causing, and, unless restrained, will continue to cause damage and immediate irreparable harm to Bronnikov and Jenka Lab for which Bronnikov and Jenka Lab have no adequate remedy at law.

<u>COUNTS</u>
<u>Count I</u>
<u>Bronnikov – Copyright Infringement</u>

74.     Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

*75*.     The Copyright Works are graphics and source code containing copyrightable subject matter for which copyright protection exists under the Copyright act, 17 U.S.C. §§ 101, *et seq*.

76.     Bronnikov is the exclusive owner of all exclusive rights under copyright in the Copyrighted Works. Bronnikov owns valid copyright registrations, issued by the United States Copyright Office, for the Copyrighted Word. *See*, Exhibit 1.

77.     The Copyrighted Works were created in-house by Bronnikov employees acting within the scope of their employment. None of these employees have any contractual rights to ownership of the Copyrighted Works, and as such Copyrighted Works constitute works made for hire.

78.     Currently, and at all relevant times, Bronnikov has been the sole owner of all right, title, and interest in and to the Copyrighted Works.

79.     The Copyrighted Works were registered within five (5) years of the first publication of the Copyrighted Works.

80.     By making the Illicit Games available for use by end-users, Defendant has publicly displayed and published pirated, hacked, and/or counterfeit copies of the Copyrighted Work, and have done so without Bronnikov's permission.

81.     Upon information and belief, Defendant's infringing conduct was, and continues to be, willful, with full knowledge of Bronnikov's interest in the Copyrighted Works, and specifically the Copyrighted Work.

82.     As a direct and proximate result of Defendant's willful, and continuing, infringement of Bronnikov's Copyrighted Works, and pursuant to 17 U.S.C. § 503(a), this Court "may order the impounding . . . (A) of all copies or phonorecords claimed to have been made or used in violation of the exclusive right of the copyright owner; . . . (C) of records documenting the manufacture, sale, or receipt of things involved in any such violation, provided that any records seized under this subparagraph shall be taken into the custody of the court."

83.     As a direct and proximate result of Defendant's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 for each work infringed with respect to Defendant's infringing use of the Copyrighted Works, and specifically the Jenka Lab Copyrighted Work, or such other amount as may be appropriate under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from the infringements, in an amount to be proven at trial.

84.     In all events, Defendant's acts are causing, and, unless restrained, will continue to cause damage and immediate irreparable harm to Bronnikov for which Bronnikov has no adequate remedy at law. Bronnikov is thus entitled to impoundment of the Illicit Games, a temporary restraining order, preliminary injunction, and permanent injunction.

## Count II
### Bronnikov – Contributory Copyright Infringement

85.    Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

86.    Defendant has no authorization, permission, license, or consent to use and/or utilize and exploit the Copyrighted Works in the Illicit Games at issue.

87.    Defendant had knowledge the Illicit Games are unauthorized, pirated, hacked, and/or counterfeit copies of, among others, the Copyrighted Works.

88.    Defendant materially contributed to the continued infringement of Bronnikov's Copyrighted Works by continuing to provide the Illicit Games in commerce.

89.    The foregoing acts of infringement by Defendant have been willful, intentional, and purposeful, in complete disregard of Plaintiffs' rights.

90.    As a direct and proximate result of Defendant's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 for each work infringed with respect to Defendant's infringing use of the Copyrighted Works, or such other amount as may be appropriate under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from the infringements, in an amount to be proven at trial.

91.    Plaintiffs are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## Count III
### Infringement of Plaintiffs' Federally Applied-For and Registered Marks (15 U.S.C. §1114)

92.    Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

93.    The Jenka Lab Registrations for JENKA LAB and the JENKA LAB design mark are valid and subsisting, and are *prima facie* evidence of the validity of the Jenka Lab Marks, of Jenka Lab's ownership of the Jenka Lab Marks, and of Jenka Lab's exclusive right to use the Jenka Lab Marks for the goods enumerated in the Jenka Lab Marks Registrations, including but not limited to gaming machines, namely, slot machines and video lottery terminals. By virtue of the Jenka Lab Marks Registrations, the Jenka Lab Marks are entitled to protection under the Lanham Act, 15 U.S.C. §§ 1051, et seq.

94.    In violation of 15 U.S.C. § 1114, Defendant used in commerce, without Jenka Lab's consent, either a reproduction, counterfeit, copy or colorable imitation of the Jenka Lab Marks on and in connection with the sale, offering for sale, distribution, or advertising of counterfeit Jenka Lab works (the "Infringing Marks"), which use is likely to cause confusion with Defendant and Jenka Lab, or to cause mistake, or to deceive consumers.

95.    Defendant's actions – most significantly, their refusal to stop use of the Infringing Mark (as described above) -- demonstrate that their infringement is intentional, willful, and malicious; Defendant is clearly trading on the goodwill associated with Jenka Lab's Registered Marks.

96.    As a direct and proximate result of Defendants' willful misconduct, Jenka Lab has suffered irreparable harm to the value and goodwill associated with the Jenka Lab Trademarks, and to Jenka Lab's reputation in the industry. Unless the Defendant is restrained and enjoined from further infringement of the Jenka Lab Trademarks, Jenka Lab will continue to be irreparably harmed.

97.     As a direct and proximate result of Defendant's willful misconduct, Jenka Lab has suffered lost sales.

98.     Jenka Lab has absolutely no remedy at law that could compensate it for the continued, irreparable harm that is will suffer if the Defendant's willful misconduct is allowed to continue. Accordingly, Jenka Lab seeks, and is entitled to, both preliminary and permanent injunctive relief.

99.     As a direct and proximate result of Defendant's willful misconduct, Jenka Lab also has suffered damages to the valuable, registered Jenka Lab Trademarks; to its reputation among U.S. Consumers; to the goodwill associated with the Jenka Lab Trademarks and brands; and other damages in an amount not yet known, but to be proven at trial. Jenka Lab is also entitled to statutory damages, enhanced damages, and/ or its reasonable attorneys' fees.

Count IV
Jenka Lab and Bronnikov - Trademark Infringement, False Designation of Origin and
Unfair Competition Under Lanham Act § 43(a) (15 U.S.C. § 1125)

100.     Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

101.     Jenka Lab is the sole distributor of Bronnikov's games, selling them as either software boards or freestanding gaming cabinets.

102.     Defendant has marketed, publicly displayed, presented, and offered to consumers their Illicit Games, which mimic the Copyrighted Works, in interstate commerce. The Illicit Games were neither authorized, created, sold, licensed, sponsored, nor distributed by Plaintiffs.

103.     Defendant is passing off its Illicit Games as those authorized, created, licensed, sold, and/or distributed by Plaintiffs.

104.    Defendant's Illicit Games are likely to cause confusion between Defendant and Jenka Lab, mistake, or deceive the consuming public as to the origin, source, sponsorship, or affiliation of their Illicit Games. Actual and potential consumers, upon encountering Defendant's Illicit Games, are likely to mistakenly believe that Defendant's Illicit Games originate with, or are sold, licensed, approved, sponsored by, or otherwise affiliated with Plaintiffs.

105.    By their unauthorized conduct, use of counterfeit copies of the Copyrighted Works, and unauthorized use of Plaintiffs' trademarks, Defendant has engaged in unfair competition with Plaintiffs, false designation of origin, and misleading description and representation of fact in violation of the Lanham Act, 15 U.S.C. § 1125(a).

106.    Upon information and belief, Defendant's actions have been, and continue to be, willful and with the intent to profit from the goodwill established by Plaintiffs in the Aurora Link game. Defendant's actions are intended to cause confusion with Defendant and Jenka Lab, mistake, or deception as to the affiliation, connection, or association of Defendant with Plaintiffs.

107.    Bronnikov and Jenka Lab are entitled to an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys' fees and costs, under 15 U.S.C. §§ 1116-17, as well as pre- and post-judgment interest.

108.    Defendant's conduct is causing immediate and irreparable harm and injury to Bronnikov and Jenka Lab, and to their goodwill and reputation, and will continue to both damage Bronnikov and Jenka Lab and confuse the public unless enjoined. Bronnikov and Jenka Lab have no adequate remedy at law. Bronnikov and Jenka Lab are thus entitled to a temporary restraining order, preliminary injunction, and permanent injunction.

<u>Count V</u>
<u>Bronnikov – Misappropriation of Trade Secrets Pursuant to 18 U.S.C. § 1836(b)</u>

109.    Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

110.    Bronnikov's confidential information includes trade secrets and/or other proprietary information that derives independent economic value from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

111.    Bronnikov's confidential and trade secret information has been and continues to be the subject of reasonable measures to keep such information secret.

112.    Defendant misappropriated such confidential and trade secret information of Bronnikov in connection with the distribution and sale of the Illicit Games.

113.    Defendant, at the time of use, knew, or had reason to know the Illicit Games and the confidential and trade secret information used to create the Illicit Games were derived from or through a person who had utilized improper means to acquire such information.

114.    As a result of Defendant's misappropriation, Bronnikov has been and continues to be damaged and irreparably injured, including, without limitation, the loss of sales and profits it would have earned but for Defendant's actions, and damage to Bronnikov's reputation among potential and existing customers, business partners, investors, and in the industry in general.

115.    Defendant's misappropriation is willful and malicious and thereby entitles Bronnikov to an award of exemplary damages.

116.    Defendant's misappropriation of Bronnikov's confidential and trade secret information has caused and will continue to cause Bronnikov irreparable and substantial injury and, therefore, cannot be fully redressed through damages alone. An injunction prohibiting

Defendant from further use or disclosure of Bronnikov's confidential and trade secret information is necessary to provide Bronnikov with complete relief.

<u>Count VI</u>
<u>Bronnikov – Common Law Trademark Infringement</u>

117.    Plaintiffs repeat, reallege and incorporate the allegations in the paragraphs above as if fully set forth herein.

118.    Bronnikov Marks have been used in commerce and are applied-for with the United States Trademark Office and furthermore used in commerce, the relevant trade and consuming public have come to understand Bronnikov Marks as identifying Bronnikov and/or its affiliates indicating the source of origin of Bronnikov's services as coming from Plaintiff and its affiliate Jenka Lab.

119.    Defendant have used, and are continuing to use, designations that are confusingly similar and/or identical to Plaintiff's Mark in interstate commerce, including the Commonwealth of Pennsylvania, in connection with products and services identical to those offered under Bronnikov Marks.

120.    Defendant's unauthorized use of the infringing services is likely to cause confusion in the marketplace between the parties' respective services as the services and goods are identical.

121.    Defendant's infringement of Bronnikov Marks is in willful and wanton disregard of Bronnikov's rights in and to the same, and without the consent of Bronnikov or its affiliate Jenka Labs.

<u>Jury Demand</u>

122.    Plaintiffs demand a trial by jury for all issues so triable.

<u>Prayer For Relief</u>

WHEREFORE, Plaintiffs request the following relief against Defendant:

A.     That Defendant and its agents, servants, employees, attorneys, successors, and assigns, and any and all persons acting in concert or participating with it, or any of their successors or assigns or any of them, be preliminarily and permanently enjoined and restrained from directly or indirectly:

(a)     using the marks "JENKA LAB", "JENKA LAB design mark", "AURORA LINK", "AURORA SUPER LINK", "AURORA CLASSIC", "AURORA XPERIENCE" or any other reproduction, counterfeit, copy, confusingly similar variant, or colorable imitation of the Jenka Lab and Aurora marks, in commerce in any medium;

(b)     using the Bronnikov Marks or any other reproduction, counterfeit, copy, confusingly similar variant, or colorable imitation of the Bronnikov Marks, in commerce in any medium;

(c)     advertising, marketing, offering for sale, providing, or selling the Counterfeit Products;

(d)     using the Infringing Marks, or any reproduction, counterfeit, copy, confusingly similar variant, or colorable imitation of the same, in any manner likely to cause others to believe that Defendants' services are connected with Plaintiffs or are genuine Plaintiffs-licensed products or services;

(e)     committing any other acts that may cause the consuming public to believe that Defendant's goods and/or services are genuinely licensed by Plaintiffs or otherwise provided for the benefit of Plaintiffs;

(f)     engaging in unfair and deceptive trade practices against Plaintiffs;

(g)    shipping, delivering, holding for sale, importing, distributing, returning, transferring, or otherwise moving or disposing of any materials falsely bearing the Infringing Marks, or any other reproduction, counterfeit, copy, confusingly similar variant, or colorable imitation of the Jenka Lab Marks; and

(h)    assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (1) through (7).

B.    That Defendant and any and all persons controlled by or acting in concert with it be required to deliver to Jenka Lab for destruction all goods, packages, and any other written or printed materials, in tangible or intangible form, that bear or depict the Infringing Mark, or any other reproduction, counterfeit, copy, confusingly similar variant or colorable imitation of the Jenka Lab Marks.

C.    That Defendant be required to account for and pay to Jenka Lab Defendant's profits from sales of the infringing services and any other product or service incorporating, copying, or imitating the Jenka Lab Marks or any other brand element of Jenka Lab, or sold under the infringing mark, and such sum in addition thereto as the Court shall find just.

D.    For judgment that Defendant:

(a)    has violated the Copyright Act, 17 U.S.C. §§ 101, *et seq.*;

(b)    has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and

(c)    has violated 18 U.S.C. 1836(b).

E.    That an Order of Impoundment be entered pursuant to 17 U.S.C. § 503(a) directing the United States Marshal for the Western District of Pennsylvania to impound from Defendant and each of its officers, employees, agents, attorneys, and representatives, and all other persons, firms, or corporations in active concert or privity or in participation with Defendant, all products,

advertisements, promotional materials, packaging, and other items in their possession or under their control bearing the Copyrighted Works, or any simulation, reproduction, counterfeit, copy or colorable imitation thereof.

F.      That Defendant and its officers, employees, agents, attorneys, and representatives, and all other persons, firms, or corporations in active concert or privity or in participation with Defendant, immediately deliver to the Court for impoundment the Illicit Games violating Plaintiffs Copyrighted Works, together with an accounting, to be provided to Plaintiffs, of: (1) the number of such Illicit Games in Defendant's possession, custody, or control; (2) where each Illicit Game was found; (3) the identity of the individual or individuals having possession, custody or control of each Illicit Game at the time it was found; and (4) a sworn explanation of how each Illicit Game was obtained, duplicated, or distributed, including the identity of all persons involved in such activity for each Illicit Game.

G.      That this case be found exceptional and Plaintiffs be awarded their attorneys' fees pursuant to 15 U.S.C. § 1117(a) and/or other applicable law.

H.      That Plaintiffs recover the damages arising out of Defendant's wrongful acts in a sum equal to three times the actual damages suffered by Plaintiffs, as provided in 15 U.S.C. § 1117(b) and/or other applicable law.

I.      That Defendant be required to disgorge its profits and other ill-gotten gains pursuant to 15 U.S.C. § 1117(a) and other applicable law.

J.      That Plaintiffs have and recover the taxable costs of this civil action, including reasonable attorneys' fees, costs, and interest.

K.      That Plaintiffs be awarded punitive or exemplary damages in view of Defendant's reckless, willful, wanton acts committed with conscious disregard for the rights of Plaintiffs.

L.    That Plaintiffs have such other general and further relief as this Court deems just and proper.

Respectfully submitted, Tuesday, March 25, 2025.

*/s/Joshua A. Lyons*
Joshua A. Lyons
PA Bar No.: 94301

Maurice A. Nernberg & Associates
301 Smithfield Street
Pittsburgh, PA 15222
Telephone: 412.232.0334
jal@nernberg.com

*/s/Kennington R. Groff*
Kennington R. Groff
GA Bar No.: 782901
Melanie K. Lane
GA Bar No.: 831941
PRO HAC VICE FORTHCOMING

BEKIARES ELIEZER, LLP
2870 Peachtree Rd. #512
Atlanta GA 30305
Telephone: 404.537.3686
kgroff@founderslegal.com
mlane@founderslegal.com
